Tifield v. Adams.

---

## TIFIELD v. ADAMS.

Where, in an action for services rendered under an agreement in writing, dated February 23, 1854, to take effect on the 21st of March ensuing, and to continue for one year, in which the plaintiff undertook to perform the duties of editor of a weekly newspaper, and those of proof reader, and for which the defendant was to pay ten dollars per week for the editorial duties, and an additional compensation for the other services, it appeared that, shortly after making the contract, the defendant commenced the publication of a daily and tri-weekly, in addition to the weekly paper, and subsequently took in a partner, who became part owner of the concern; and where the defendant answered, admitting the execution of the contract, but averred that it was abandoned at the time of commencing the publication of the daily paper, and that a verbal one was substituted, by which the defendant was to pay the plaintiff twelve dollars per week; and that afterwards the plaintiff claimed fifteen dollars per week, and as they could not agree, this verbal contract also was rescinded; which answer also

Tifield v. Adams.

denied any indebtedness on the part of the defendant, and to which there was a replication in denial of the new matter; and where the following facts appeared in evidence: That the matter of the weekly paper was made up principally from the matter of the daily; that such was the usual mode· in offices publishing both a daily and weekly; that in consequence of this custom, an editor was not required especially for the weekly, but yet that the weekly would require some editorial care; that the plaintiff acted as editor of the daily, and for some weeks received twelve dollars per week; that defendant was kept from the office sometimes by illness; that H., the partner subsequently taken in, in paying the plaintiff twelve dollars for a week's service, did so under the impression that that was the sum the plaintiff was to have by the contract; that plaintiff did not so understand the contract; that on the last occasion when H. paid plaintiff, he was about to pay him twelve dollars, when plaintiff said he was to have fifteen dollars— that such was the agreement, and his services were worth that sum; that he and H. differed about it, and the latter told him that he might leave, as his services were not wanted at that price; that the plaintiff left; that in about two days afterwards, plaintiff met the defendant and H. at the house of defendant, and they tried to come to some understanding, but they could not agree, and separated without effecting anything; that in that conversation the contract between plaintiff and defendant was mentioned as subsisting; that three or four days afterwards the plaintiff left "copy" with the "hands" of the office; that H. was absent at the time, and when the "hands" asked him what was to be done with the copy, he told them not to set it up; that other tenders of service were made after that time, which were refused; that the defendant admitted that there had been an agreement, subsequent to the first one, that five dollars per week additional should be paid for the extra trouble in editing the daily, and that the increased labor in editing the daily was worth that sum; and where it was admitted that the plaintiff, since June 27, 1854, had held himself in constant readiness to fulfill his part of the contract; and where the defendant asked the court to instruct the jury as follows: "That if the plaintiff quit the office, either because he was not wanted or because his wages were not high enough, such quitting may be regarded as an abandonment of the old contract;" "2. That the fact that plaintiff quit the office, and did not edit the weekly or daily for several days, and that the parties tried to make a new contract which would have superseded the old one, may be construed to be an abandonment of the old contract by both of the parties," which instructions were given by the court, with the qualification, that if the plaintiff "*voluntarily quit,*" &c., to which qualification the defendant excepted: *Held*, That the court properly qualified the instructions.

And where, in such a case, the defendant asked the following instruction: "That if plaintiff did not wish to abandon the first contract, he should have refused to quit; but if the jury believe he did quit, and that he was absent from the office several days, the defendant had a right to refuse to receive his copy," which instruction the court refused to give: *Held*, That the instruction was properly refused.

Tifield v. Adams.

And where, in such a case, the defendant asked the court to instruct the jury as follows: "That if, after the defendant took H. into partnership, the plaintiff performed work as editor for defendant and H. and received pay from them, this, by operation of law, amounts to an extinguishment of the original contract, and the making of a new one between plaintiff and the partnership," which instruction the court refused to give: *Held*, That the court did not err in refusing to give the instruction.

Although the court may, in its discretion, give instructions, with qualifying terms, yet it is not the *duty* of the court so to correct or limit them. It may refuse the instructions totally, and leave the party proposing them to assume the hazard of their entire correctness.

Where, by the consent of the parties, the court authorized the jury to seal up their verdict, and hand the same to the court, by their foreman, and disperse, which they did; and where the verdict was opened by the clerk and read as follows: "We, the jury, find for the plaintiff, according to contract;" and where the verdict, on the motion of the plaintiff, was recommitted to the jury to be amended, to which the defendant objected, and the court instructed them, that they must "assess the amount of the plaintiff's damages, allowing the defendant all credits to which he is entitled;" and where the jury returned the verdict in the same terms, with the addition of the amount of damages found; *Held*, That as it did not appear that the jury were *not* reassembled before the verdict was opened, error was not apparent in the proceeding.

## Appeal from the Dubuque District Court.

THIS is an action brought to recover for services rendered on a written contract, dated 23d February, 1854, to take effect on the 21st March, and to continue for one year, by which the plaintiff undertook to perform the duties of editor of the Dubuque Weekly Tribune, and those of proof reader, and the defendant was to pay ten dollars per week for the editorial duties, and an additional compensation for the other services. Soon after the making of this contract, Adams commenced the issuance of a daily and tri-weekly, in addition to the weekly paper. After a little further time, probably in May, Hackley became a partner and part owner in the paper, with Adams. The defendant's answer denies all indebtedness to the plaintiff. He admits making the original contract set up by the plaintiff, but avers that this was abandoned at the time of commencing the daily paper, and that a new verbal one was substituted, by which he was to pay plaintiff twelve dollars per week; that after-

wards plaintiff claimed fifteen dollars, and, as they could not agree, this contract also was rescinded. An imperfect summary of the evidence is given, but sufficient probably is embraced to show the pertinency of certain instructions, which is its principal object. This summary states that there was evidence, showing that the matter of the weekly paper was made up principally of the matter of the daily; that such was the usual mode in offices publishing both a daily and a weekly, and that in consequence of this, an editor was not required especially for the weekly, but yet that the weekly would require some editorial care; that Tifield acted as editor of the daily, and for some weeks received twelve dollars a week; that Adams was kept from the office sometimes by illness; that Hackley testified that, in paying plaintiff twelve dollars for a week's service, he did it under the impression that that was the sum which he was to have, (that is, by the contract,) but it did not appear that Tifield so understood it; that on the last occasion when Hackley paid him, he was about to pay him twelve dollars, when Tifield said he was to have fifteen dollars; that such was the agreement, and that his services were worth that; that he and Hackley differed about it, and the latter told him he might leave, as his services were not wanted at that price, and that Tifield left; that in about two days afterwards, plaintiff met the defendant and Hackley at Adams' dwelling-house, and they tried to come to some arrangement or understanding, but they could not agree and separated without affecting anything; that the contract between Tifield and Adams was mentioned as subsisting; that three or four days afterwards, Tifield left " copy " with the "hands" of the office; that Hackley was absent at that time, and when the "hands" asked him what was to be done with the copy, he told them not to set it; that other tenders of services were made after that time, which were refused; that one witness testified that Adams admitted that there had been an agreement subsequent to the first one, that five dollars additional should be paid for the extra trouble in editing the daily; and that there was testimony, given by editors,

that the increased labor in editing the daily, was worth that additional sum. By an agreement relating to the matters in controversy, dated 27th June, 1854, it is stipulated "that from that time, the plaintiff is to be considered as holding himself in constant readiness to fulfill his part of the contract." The jury found for the plaintiff. The instructions asked and given, and the questions which arose, will be given in the opinion of the court.

*Smith, McKinlay & Poor,* for the appellant.

We take the grounds:

1. That the instructions were good law as asked for, and were applicable to the evidence and testimony, as will be seen by reference to the bill of exceptions.

2. That the qualification of the court materially changed the instruction and its efficacy.

3. That even if the qualification was immaterial, still that it was sufficient to lead the jury to believe that the instructions as asked for were bad law. That is to say, we hold it to be error to qualify an instruction which, in its original form, is good law and is applicable to the case.

And *First,* One of the points in issue was, whether the old contract had been abandoned; this might be made out by acts as well as by words; his leaving the office and not editing the daily or *weekly* for several days, were facts tending to show that the contract was abandoned; he should have remained and insisted on performing the contract, if he intended to treat the contract as of force, and to hold Adams to it also.

*Second.* Tifield's leaving might be voluntary in one sense, and compulsory in another. He might not wish to leave, and yet he might prefer to leave and not perform his part of the contract he now alleges to have been in force, rather than stay at twelve dollars a week, or stay and abide the result of a settlement of their differences in some legal way. And so far as not wishing to leave, and not being convenient for him to leave then, his quitting may in that sense have been *compulsory;* but in making his election to quit, rather

than stay as above suggested, he acted *voluntarily;* neither Adams nor Hackley compelled him to quit. Hackley merely told him that he might leave, as his services were not wanted at $15 a week; and *he did leave.* Hackley did not drive him away; he might have remained if he chose, and, taken measures for a proper settlement of their matters of difference.

But the insertion of the word *voluntary* into the instructions, led the jury to believe that without that word the instructions were bad law, and to believe that Tifield's leaving must have been *purely* voluntary, in order to warrant them in regarding it as an abandonment of the old contract. It led them to think that Tifield had the sole right to construe the relations he held with Adams or with Adams & Hackley, and that they, or either of them, had no right to contradict him.

In support of the third point, we refer to *Raver* v. *Webster*, appealed from Jones county, (supposed,) December term, 1854; *Ivey* v. *Phifer*, 11 Ala. 535; *Clealand* v. *Walker*, 11 Ala: 1058; *Hinton* v. *Nelms,* 13 Ala. 222; *Cole* v. *Spann*, 13 Ala. 537.

The fourth instruction asked for, and which was refused by the court, is: "That if Tifield did not wish to abandon the first contract, then he should have refused to quit; but if the jury believe that he did quit, and that he was absent for several days from the office, that Adams had a right to refuse to receive his copy which he brought after they failed to make a new contract."

Tifield was told he might quit, as his services were not wanted at $15 a week—that is, his services for the Daily, Tri-Weekly and Weekly Tribune. If he intended to hold Adams to the original contract for the weekly, he should then have refused to quit. Having quit when permission was given him, and having remained absent for several days, while, in the meantime, the Daily, Tri-Weekly and Weekly Tribune was being edited by Hackley, Tifield had no right to bring the contract again into force, without the consent of Adams.

The eighth instruction asked for, and which was refused by the court, is: "That if the jury believe that, after the entering into the written contract, Adams took Hackley into partnership, and that after the formation of such partnership, Tifield performed work as editor of the Tribune for Adams & Hackley, and received pay from them; that such, by operation of law, amounts to an extinguishment of the contract between Adams and Tifield, and the making of a new contract between Tifield on the one part and the partnership of Adams and Hackley on the other."

In support of this position, we refer to Story on Partnership, 3d edition, page 253, note 2 to section 155; *Hart* v. *Alexander*, 2 Meeson & Welsby, 484; Story on Partnership, § 255.

By consent of parties, the jury were authorized by the court to seal up their verdict and hand the same to the clerk, by their foreman, and disperse. They did so. Their verdict was unsatisfactory to the plaintiff, and at his instance the jurors were re-assembled, the defendant objecting thereto.

As soon as the jury handed in their verdict and dispersed, their mission was at an end. See *White* v. *Martin*, 2 Scam. 69; *Miller* v. *Hoe*, 1 Branch, 189; 7 U. S. Dig., page 480, § 19; *Settle* v. *Alison*, 8 Georg. 201; 12 U. S. Dig. 587, § 4; *Sargent* v. *State of Ohio*, 11 Ohio, 472.

The court erred in rendering judgment on the verdict. The whole case shows conclusively that Tifield, by his entering upon the duties of the Daily and Tri-Weekly Tribune, assented, if not to an abrogation of the original contract, at least to such an alteration of it as to destroy its force, unless in its altered shape, or unless Adams should consent to discontinue the daily and tri-weekly. In that office, as is the usual mode in offices where a daily and weekly newspaper is published, the weekly was made up of the matter published in the daily, with the exception of a few articles, and so no editor was specially required for the weekly. Tifield consented to the publication of the daily, and was its editor for several weeks, and the weekly was made up from it; he had no right, when he and Adams

could not agree as to what his pay should be, to say that he would now edit the weekly only, and thereby throw on Adams the unreasonable and unprecedented expense of having different editors for different issues of the paper, and the necessary further expense of setting up the different matter for the different issues, and make the Tribune virtually two papers instead of being a daily and weekly issue of one paper.

It may be that the original contract was in force, but if so, it was not in force in its original form or effect, but only as a basis for the further contract for the daily and tri-weekly, in conjunction with the weekly. If in force, Tifield was entitled to ten dollars a week, and to as much more as he might have agreed for, if an agreement was made as to the compensation for the additional labor caused by the daily and tri-weekly, and if no agreement were made as to the additional compensation, he was entitled to the ten dollars, and as much more as the additional labor was really worth. This is the view we all along contended for, and we think it is the only reasonable view that can be taken of the case. It is perfectly unprecedented to compel a man to pay for services which are not rendered, *and which, if rendered, would be of no use.* Adams had no use for an editor of the weekly, specially as editor, so long as the daily should be published. And Tifield, by his acts, having consented that a daily should be published, had no right to compel Adams to discontinue the daily, or to accept Tifield's services as editor of the weekly, when the daily furnished almost all its matter. Therefore we say the court erred in rendering judgment on the verdict. The record, instead of showing a state of facts that would entitle Tifield to recover, shows precisely an opposite state of facts.

*Wiltse & Blatchley*, for the appellee.

The position is taken for defendant, that the evidence did not authorize the verdict of the jury, and the judgment of the court; that the evidence showed that Tifield himself abandoned the contract. When did Tifield abandon the

Tifield v. Adams.

contract? Not at the time of his dismission, for Adams, Hackley, and Tifield had a conference two or three days afterwards, at which the contract was treated as still subsisting. Not at the time of this conference, for almost immediately afterwards Tifield tendered copy. The jury were plainly of opinion that Tifield at no time intended to abandon his contract, and that the quarrel picked with him was part of the game of Hackley to oust Tifield and take his place. Hackley succeeded, and holds the place to this day. This view is justified even by the imperfect summary of the evidence given in the bill of exceptions.

The question of the abandonment of his contract by Tifield, is one peculiarly within the province of the jury, and their decision of the matter will certainly not be overruled by this court, unless their decision was manifestly wrong, and unless all the evidence which was before the jury is spread before this court. This the bill of exceptions does not purport to do. It does not even give the names of the numerous witnesses who testified in the case. We understand the rule to be thoroughly established here, that this court will not reconsider a question decided by a jury, unless the bill of exceptions shows affirmatively that it embraces all the evidence on which the jury formed their opinion; and there certainly never was a case which came more clearly within the technical requirements of this rule than the present, nor one which, in its circumstances, better illustrates its justice and necessity.

Defendant insists that the court below erred in qualifying and refusing certain instructions. The great point made in the case by defendant was, that Tifield himself abandoned the contract, left Adams of his own accord, and the instructions were intended to affect the jury in this connection. All that the court did, was to provide against any inference which the jury might draw from the instructions, that Tifield should have stayed in the office until he was bodily expelled. Hackley, the business manager of the printing office, the partner and agent of Adams, had told T. his services were not wanted; had taken away the key to the post-office box;

had taken away the exchanges. It certainly was not necessary after this to stay in the office, insisting on going on with his work under the contract, till he was kicked down stairs. The jury were not to be instructed that, because he quit the office under such circumstances, he abandoned his contract. The propriety of the refusal of an instruction to this effect, and the propriety of qualifying other instructions by the word voluntarily, is therefore, we think, apparent even from the meagre account of the testimony and trial contained in the transcript.

Defendant makes the point that Tifield, in editing the paper after the formation of the partnership between Adams and Hackley, worked, not under the contract for Adams, but under a new contract for the firm; that the editing the paper after the partnership was effected, destroyed *per se* and by operation of law, the separate contract with Adams, and released him from all obligations under it. This is a strange doctrine, and we cannot see that it receives the slightest countenance from the authorities cited to support it. Whether or not Adams formed a partnership, Tifield had no right to interfere on the ground of anything in his contract. If Adams chose to have the aid of a partner to assist him in carrying on the printing business, involving, among other things, the fulfillment of his contract, with himself, could Tifield object? By the formation of the partnership, the proprietorship of the Tribune vested in Adams & Hackley, and if Tifield edited it at all, he must in one sense work for the firm. Was, therefore, Tifield authorized to claim that he was released from all obligations under the contract; that by operation of law the contract was dissolved? If the partnership was inconsistent with the contract, then Adams in taking a partner violated the contract, and Tifield was authorized to abandon the office immediately, and sue for damages. The parties to it evidently regarded the contract as still in force under the partnership, and, as has already been said, even so late as two or three days after Tifield's dismission, it was expressly recognized as still subsisting.

Defendant makes a point of what occurred during the

Tifield v. Adams.

trial. The jury, when out, first returned a sealed verdict and dispersed. The verdict was simply for plaintiff, "according to the contract." The same jury were assembled again, and instructed to find the amount due. This, of course, was to be ascertained by multiplying the number of weeks during the life of the contract, after dismission, viz: forty, by ten, the number of dollars per week due under the contract. This was all the jury had to do—a mere matter of calculation and form, which we submit might have been done by the clerk. There was never any dispute between the parties as to how much was due, provided anything was due. The grand·question in dispute, and which a jury was wanted to decide, was whether Tifield was entitled to any damages; whether Tifield abandoned the contract, or Adams dismissed him? These, the substantial questions in the case, the jury, by their original sealed verdict, decided in favor of Tifield. These being decided, the whole case was decided. If Tifield was entitled to a cent " according to the contract," nobody ever doubted that he was entitled to $10 a week. There is no question as to the perfect fairness and regularity of the sealed verdict, and that decided the question whether Adams had violated the contract, and Tifield was entitled to damages, and there is therefore no reason for a new jury to decide that. The question how much—a mere question of figures and multiplication, about which there is no issue and no dispute—surely a new jury is not required to settle this. It is plain that defendant has suffered no harm—the grand issues which he presented have been decided with fairness and unexceptionable regularity. Why, then, should he have a new trial?

The examination of authorities which we have made, does not favor the idea that when the amendment to the verdict could not possibly injure the defendant, and especially when it might be regarded rather as a mere matter of form than otherwise, the courts will decree a new trial. *Vide* 18 Vermont, 180; 2 Vermont, 562.

Four or five juries in the justice's court and in the District Court, have decided the grand questions involved in

this case, as they are decided by the verdict under consideration. It would seem about time to consider them settled.

As to liability of defendant to pay plaintiff while waiting on him, *vide* 2 Greenl. Ev., § 261, and note.

WOODWARD, J.—The defendant requested the court to give the following instructions to the jury: 1. That if Tifield quit the office, either because he was not wanted, or because his wages were not high enough, such quitting may be regarded as an abandonment of the old contract; which the court gave, with this qualification: "If Tifield *voluntarily* quit," &c. To this qualification, the defendant excepted. He also asked the following: "2. That the fact that Tifield quit the office, and did not edit the weekly or daily for several days, and that they tried to make a new contract which would have superseded the old one, may be construed to be an abandonment of the old contract by both of the parties," which the court gave, with the qualification: "If his quitting was voluntary;" to which qualification the defendant excepted, and these are assigned as error.

We do not think these instructions are good law, in the form proposed by counsel. In the first one, the first supposed cause for leaving, "because he was not wanted," is vague and ambiguous. It implies a failure (at least) of employment under the contract, if it does not also imply a delinquency on the part of Adams, in furnishing such employment. It may also carry the idea, that there was an unwillingness in the latter to have him remain employed in the office. Under none of these circumstances, would his leaving amount to an abandonment on his part. The second supposed cause of leaving, because his wages were not high enough, may imply delinquency on the plaintiff's side, fairly enough, but as the party associated this with the other cause, which is bad, and could not be given without qualification, he must lose the benefit of this. The second of the above instructions requests the court to *assume* the fact, that T. did quit the office, and did not edit the paper for several days; and then to charge the jury that from that

Tifield v. Adams.

fact, and from the parties having tried to make a new contract which should supersede the old one, they might infer an abandonment.    The court was certainly right in refusing this.    This court has been called upon to reverse judgments for the reason, that instructions to the jury assumed facts to be proven, and the District Court was correct in declining to do so.    It went full far enough, in favor of the defend-ants, in giving the instruction with the qualified expression.

The defendant requested the following instructions: "That if Tifield did not wish to abandon the first contract, he should have refused to quit; but if the jury believe he did quit, and that he was absent several days from the office, Adams had a right to refuse to receive his copy, which he brought after they failed to make a new contract," which the court refused to give, and the defendant excepted. Although the court may, in its discretion, sometimes give instructions, with qualifying terms, yet it is not the *duty* of a court so to correct or limit them.    It may refuse them totally, and leave the party proposing them to assume the hazard of their entire correctness.    This instruction com-mences with taking for granted a fact, and that too, one which, if proved, would not benefit the defendant.    That part of it also, which relates to the party's quitting, is totally unqualified in reference to the *cause* which may have influ-enced him to leave, if in fact he did so.    We think the court did right in refusing to give this in charge.    In these instructions the word "*quit*" needs explanation, in order to a perfect understanding.    If it means leaving the office, that is an immaterial circumstance.    If it means leaving the work of editor, then the assumption is contradicted by the testi-mony, which says that he continued to offer copy, and no other refusal to quit was called for than a silent continuance in the discharge of his duties.

The defendant further asked the court to charge the jury, "that if, after Adams took Hackley into partner-ship, Tifield performed work as editor for Adams & Hack-ley, and received pay from them; this, by operation of law, amounts to an extinguishment of the original contract, and

the making a new one between Tifield and the partnership. The court declined to give this instruction, and in this it did not err. Adams could not release himself from his contract, by entering into a partnership; nor does Tifield's continuance in the discharge of his duties, though during the existence of the partnership, imply a waiver of the first agreement. The burden is on Adams to show the substitution of a new arrangement.

A further error assigned, arises on the following facts: By the consent of the parties, the court authorized the jury to seal up their verdict, and hand the same to the court by their foreman, and disperse. They did so seal the verdict and separate. The verdict was opened and read· by the clerk in open court. It was as follows: "We, the jury, find for the plaintiff, according to contract." The plaintiff moved that the verdict should be recommitted to the ·jury to be amended, which was done, the defendant objecting. The court instructed them, that they must "assess the amount of the plaintiff's damages, allowing the defendant all credits to which he is entitled." The jury returned the verdict in the same terms as before, with the addition of the amount of damages found. It does not appear to us that this proceeding is erroneous. The practice of permitting a jury to separate, after agreeing upon and sealing up their verdict, is common with us, and is convenient, especially when the jury is sent out at a late hour in the day. But the practice should be carefully guarded against all abuse. Usually the jury is assembled in their box before the verdict is opened, and this should be the course. It is possible that in the present case, the defendant intends that the court shall infer, that the jury were not re-assembled before the verdict was opened. This is not apparent. If such was the fact, and if it would change the case, the defendant's bill of exceptions should have made it clear. The *inferences* are to be in favor of the court. We do not stop to determine whether this would make a difference, but take the facts in the present instance to have been according to the usual practice. In all cases of the rendition of a sealed verdict,

Tifield v. Adams.

the court should be careful to have the jury present at the opening of the verdict, if it be at all practicable; for this is the only opportunity for the correction of the verdict, when it is so informal that it cannot be rectified by the court, as in the present cause. · In *Douglass* v. *Tousey*, 2 Wend. 352, it was late in the evening when the cause was committed to the jury. The judge, without the express consent of counsel, directed them to seal up their verdict, and bring it in the next morning. They presented it, and when polled one of them refused to agree to it. They were sent out again. It was held to be no error. This case is very analogous to the one at bar. See also *People* v. *Douglass*, 4 Cow. 26; 1 Cow. 221; 5 Cow. 283; *Bunn* v. *Hoyt*, 3 Johns. 255; *Lawrence·* v. *Stearns*, 11 Pick. 501.

It is further to be remarked, that in the present case, in order to abbreviate the proceedings, and to save trouble and expense, the parties entered into an agreement, by which it is provided, that if the verdict be in favor of plaintiff, judgment shall be entered for the whole amount which, under such finding, would be due under the contract to the plaintiff up to the time of rendering judgment." It would appear from this agreement, that the only real question between the parties was, whether the defendant was still liable on his original contract, and that if he was, the *amount* was determinable by the contract itself. Almost might the clerk himself compute the damages on this agreement. There was nothing to be done by a jury, beyond what is to be done on a promissory note, except the ascertainment of the payments to which the defendant was entitled. We recognize the thought, that the purity of trial by jury is to be guarded with undiminished jealousy, but we do not think it has been in the least degree contaminated in the present instance. The judgment of the District Court is affirmed.